UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PEYMAN BAHADORAN,

             Plaintiff,

  -against-

THE CITY OF NEW YORK; OFFICER JILLIAN SUAREZ, Shield No. 12671, and OFFICER BRYAN ROZANSKI, Shield No. 26377,

             Defendants.

**COMPLAINT AND JURY DEMAND**

**ECF CASE**

Plaintiff Peyman Bahadoran, by and through his attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, for his Complaint alleges as follows:

**PRELIMINARY STATEMENT**

1.    This is a civil rights action brought by Plaintiff Peyman Bahadoran for damages under 42 U.S.C. § 1983 and the laws of the State of New York. It involves a horrific and shocking police shooting of an unarmed man that left him permanently paralyzed below the waist and with only partial use of his left hand. There is no legitimate or credible defense to what happened here; the entirety of Defendants' outrageous misconduct is captured on video.

2.    On June 4, 2020, Defendants New York Police Department ("NYPD") Officers Jillian Suarez and Bryan Rozanski shot Peyman Bahadoran in the lower back and left arm during a confrontation outside a Manhattan convenience store. Mr. Bahadoran was unarmed and posed no serious threat of injury nor risk of serious harm to the officers at the time the officers shot him.

3. In the days leading up to the shooting, Mr. Bahadoran, a former Wall Street trader who suffers from bipolar disorder, had watched multiple violent confrontations between law enforcement and Black Lives Matter demonstrators in Union Square from the window of his apartment. He repeatedly saw law enforcement and protesters shouting at each other and engaging in physical altercations. Mr. Bahadoran became agitated and afraid. His agitation triggered a manic episode that began the morning of June 4, 2020.

4. That morning, Mr. Bahadoran entered a convenience store in the midst of his manic episode. Not realizing what he was doing, Mr. Bahadoran waved a knife at the store clerk when asking for a pack of cigarettes. When the clerk offered him the cigarettes, Mr. Bahadoran placed his knife on the counter to accept them. The clerk then took Mr. Bahadoran's knife and handed it to NYPD Officer Melissa Brown, who was present at the store.

5. Still suffering from his manic episode, Mr. Bahadoran exited the convenience store with only a plastic beverage bottle in his hand. He was quickly surrounded by four police officers, all of whom aimed their firearms at him. Mr. Bahadoran had no knife, no weapon, or anything that posed a threat to the officers in his hands.

6. As the officers approached him, Mr. Bahadoran gestured with his arms for them to get away from him.

7. In that moment, the officers knew Mr. Bahadoran no longer had possession of any knife, that Mr. Bahadoran was not in possession of any other visible weapon, and that Mr. Bahadoran was doing nothing more than walking in an agitated manner as the officers continued to confront him. Mr. Bahadoran did not act in a violent or truly threatening manner towards any officer. He posed *no* serious risk to *any* officer's safety.

8. Despite the lack of any credible safety threat, and despite the presence of four police officers trained in non-lethal techniques to subdue a civilian, Defendants Suarez and Rozanski instead chose to shoot Mr. Bahadoran with their firearms.

9. One of the shots struck Mr. Bahadoran in the lower spine, rendering him paralyzed below the waist. As a result, Mr. Bahadoran is unable to walk or control critical bodily functions.

10. The other bullet struck Mr. Bahadoran in the left arm, compromising his ability to control his left hand and arm. He can no longer fully close his left hand and cannot use it to grasp objects.

11. By using their firearms to shoot Mr. Bahadoran in the back and arm when he was unarmed, non-violent, and presenting no risk of serious injury to any person, Defendants Suarez and Rozanski deprived Mr. Bahadoran of his rights under the Fourth and Fourteenth Amendment to the United States Constitution to be free from gratuitous and excessive force. They further breached the duty of care they owed Mr. Bahadoran and negligently caused the massive injuries he suffered in the assault.

12. The City of New York is also liable for its negligent hiring, training, discipline, and retention of Defendants Suarez and Rozanski due to its failure to provide necessary, proper, and appropriate training for its employees, including, but not limited to, failure to instruct them on the proper non-lethal techniques to subdue an unarmed civilian who poses no risk of serious injury.

13. Mr. Bahadoran suffered immense injury as a result of Defendants' unconscionable, unjustifiable, and excessive use of force. The damage and injuries he has suffered are permanent and life-altering, and he continues to suffer substantial physical and

emotional pain from his traumatic experience. He lost the use of his lower body, including the control of his bodily functions. He lost the full use of his left hand and arm. Mr. Bahadoran no longer enjoys the most basic life activities and functions: he can no longer play in the park with his young daughter, dance with his partner, or walk around town with his family. He is substantially restricted in his ability to move freely about the world. His loss of bodily function requires him to follow a specific, time-consuming bathroom routine to ensure his bladder does not burst, making it difficult for him to be away from home for more than a few hours.

14. Mr. Bahadoran's substantial and debilitating injuries are permanent. He will live the remainder of his life in a state of paralysis. But he didn't have to, as the use of deadly force was plainly excessive and unnecessary. Had Defendants Suarez and Rozanski used the lesser, appropriate amount of force, Mr. Bahadoran would be walking today. Instead, the officers chose to subdue an unarmed, non-violent man with excessive and unnecessary lethal force. They and the City of New York must be held accountable.

## **THE PARTIES**

15. Plaintiff Peyman Bahadoran is a citizen of the United States and at all relevant times was a resident of Manhattan, New York.

16. Defendant City of New York ("City") is a municipality organized and existing under the laws of the State of New York. At all relevant times, the City, acting through the New York City Police Department, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters, including the appointment, training, supervision, and conduct of all NYPD personnel. In addition, at all relevant times, the City was responsible for enforcing the rules of the NYPD and ensuring that NYPD personnel obey the laws of the United States and the State of New York.

17. Defendant NYPD Officer Jillian Suarez, shield no. 12671, was, at all times relevant to this Complaint, a police officer employed by the City. In this role, Defendant Suarez was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York. At all relevant times, she was acting in the scope of her employment and under color of state law.

18. Defendant NYPD Officer Bryan Rozanski, shield no. 26377, was, at all times relevant to this Complaint, a police officer employed by the City. In this role, Defendant Rozanski was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York. At all relevant times, he was acting in the scope of his employment and under color of state law.

## JURISDICTION AND VENUE

19. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and New York state law.

20. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

21. The acts complained of occurred in the Southern District of New York, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

22. Plaintiff demands trial by jury.

## FACTUAL ALLEGATIONS

23. Mr. Bahadoran is a 56-year-old immigrant who has lived in the United States for over 37 years. He gained United States citizenship in 1994. He resides with his 13-year-old daughter and her mother, Mahchbil Efedi.

*Background*

24. Mr. Bahadoran was born in Iran on July 7, 1964. He fled Iran as a teenager and obtained a visa to begin his college education in the United States. He earned a bachelor's degree in finance from the University of Wisconsin-Madison, followed by an MBA from the University of Pittsburgh.

25. After receiving his MBA, Mr. Bahadoran began a promising career in finance. He worked at various financial institutions and firms in Chicago and New York City. He became a citizen of the United States. In the late 1990s, he settled in New York City for good.

26. On September 11, 2001, Mr. Bahadoran was working at the New York Stock Exchange. His experience during the attack traumatized him.

27. In 2005, he was diagnosed with bipolar disorder after an episode at work triggered his paranoia.

28. Over the next 14 years, Mr. Bahadoran persevered in trying to manage his illness while earning an income for his family.

29. Then, in March 2018, Ms. Efedi was diagnosed with cancer. Mr. Bahadoran was again thrown into an almost manic state and has been struggling with his mental health ever since. It was under these chaotic circumstances in his life that COVID-19 struck in March 2020, followed by the social unrest in New York City accompanying the Black Lives Matter movement in May and June 2020.

*Mr. Bahadoran Suffers a Manic Episode*

30. On June 4, 2020, Mr. Bahadoran was a resident of 145 4th Avenue, Apt. 8M, New York, New York 10003.

31. Mr. Bahadoran had been having trouble sleeping the days prior due to the social unrest related to the Black Lives Matter protests occurring around Union Square near his home and due to his strong reaction to those events.

32. In the early morning of June 4, 2020, Mr. Bahadoran rose from his bed after yet another sleepless night.

33. Mr. Bahadoran began experiencing a manic episode, which compromised his judgment and ability to think rationally.

34. Panicked and terrified by the sounds of unrest outside, Mr. Bahadoran retrieved a hunting knife from a survival bag he had prepared a few years ago after watching a television show. He secured the hunting knife to his belt.

35. Mr. Bahadoran leashed his Jack Russell terrier, Max, and exited the apartment with him. Together, they walked south from Mr. Bahadoran's home.

36. Partway through his walk, Mr. Bahadoran picked up a bottled beverage from an outdoor vendor and continued walking. In his manic state, he did not realize that he had not paid for the beverage. He carried it with him for the remainder of his walk.

37. At approximately 6:30 a.m., Mr. Bahadoran entered Healthy Greens Gourmet, a deli located at 48 Third Avenue, New York, New York 10003.

38. Mr. Bahadoran was still in the midst of a manic episode when he entered the deli.

39. Defendant Suarez and Officer Melissa Brown had entered the deli moments prior to Mr. Bahadoran.

*A Deli Worker Removes the Knife from Mr. Bahadoran*

40. Inside the deli, Mr. Bahadoran became agitated.

41. He unsheathed his knife and held it over his head. He did not swing, thrust, or strike the knife at any time.

42. On information and belief, Defendant Suarez immediately used her police radio to request additional NYPD officers to the deli. She exited the deli and monitored the situation from the outside of the deli's glass entry door.

43. With his knife above his head, Mr. Bahadoran approached the deli cashier and asked for a pack of Marlboro cigarettes.

44. The cashier grabbed a pack and held it out to Mr. Bahadoran.

45. Mr. Bahadoran placed his knife on the counter and took the pack from the cashier.

46. The cashier immediately grabbed the knife from the counter and handed it to Officer Brown.

47. Mr. Bahadoran stepped back from the counter and raised his hands above his head. In one hand, he held a plastic beverage bottle. His other hand was empty. He was unarmed.

***NYPD Officers Shoot Mr. Bahadoran When He Is Unarmed***

48. Still in a manic state, Mr. Bahadoran walked toward the deli entry door.

49. Defendant Suarez blocked his way out. Still agitated, Mr. Bahadoran pushed Defendant Suarez out of the way. He still had only the beverage bottle in his hands.

50. Mr. Bahadoran paced around the sidewalk outside the deli in an agitated manner.

51. A few seconds later, Defendant Rozanski and two other police officers ran towards Mr. Bahadoran from the other side of the street.

52. Mr. Bahadoran turned toward the approaching officers. One officer approached Mr. Bahadoran directly while Defendant Rozanski remained approximately six to ten feet back and to Mr. Bahadoran's right side.

53. Mr. Bahadoran, still agitated, raised his hands against the officer's direct approach. In his manic state, Mr. Bahadoran was attempting to "shoo" the officer away from him.

54. In one raised hand, Mr. Bahadoran still was carrying only a plastic beverage bottle. The other hand was empty.

55. Mr. Bahadoran had no weapon in his possession at that time.

56. Mr. Bahadoran had not attempted any injury to any person throughout the entire altercation.

57. Even under the most aggressive interpretation of Mr. Bahadoran's actions in that moment, Mr. Bahadoran had done nothing more than push an officer away from himself.

58. None of Mr. Bahadoran's conduct to that point constituted a risk of serious injury to *any* officer.

59. Under NYPD Procedure No. 221-01, titled "Force Guidelines,", the officers, including Defendants Suarez and Rozanski, were required to "use only the reasonable force necessary to gain control or custody of" Mr. Bahadoran.

60. Under the Force Guidelines, Defendants Suarez and Rozanski should have subdued Mr. Bahadoran, an unarmed and non-violent civilian, with non-lethal force.

61. Instead, when Mr. Bahadoran raised his hands to shoo away the approaching officer, both Defendant Rozanski and Defendant Suarez immediately shot him with their firearms.

62. Their bullets struck Mr. Bahadoran in the lower spine and left arm.

63. Mr. Bahadoran fell to the ground, unable to move.

***Mr. Bahadoran Has Suffered Persistent Physical and Mental Injury***

64. Mr. Bahadoran has suffered severe physical and mental pain and injury as a result of Defendants' use of excessive force.

65. The bullet injuries to Mr. Bahadoran resulted in near-complete paralysis of Mr. Bahadoran's body from the waist down and partial loss of function to Mr. Bahadoran's left arm and hand.

66. The injuries were indescribably painful, both physically and emotionally.

67. Mr. Bahadoran underwent two surgeries and was an inpatient at Bellevue Hospital for 54 days, from June 4, 2020 to July 28, 2020, as he physically recovered from his injuries.

68. During that time, he had to learn to live with his newly limited body.

69. Mr. Bahadoran lost the use of his legs and is now wheelchair-bound. He has lost the ability to engage in any activities that require walking or other significant mobility. He faces years of grueling physical therapy with a prognosis of limited improvement at best.

70. He does not receive any neural signals from the organs in his lower body, so he does not know when he needs to void waste and cannot control the voiding process. As a result, Mr. Bahadoran must always wear adult diapers and must go to the restroom on a regular and frequent schedule to void waste before it builds up and disrupts his organs.

71. Mr. Bahadoran also suffers from daily intense pain spasms throughout his body, and likely will have these spasms for the rest of his life.

72. Mr. Bahadoran is limited in his ability to use his left arm or hand to hold or carry items. He cannot fully grasp anything with his left hand.

73. These physical injuries exacerbate the emotional injuries from Mr. Bahadoran's traumatic experience. Mr. Bahadoran remains in constant and significant emotional distress.

74. Mr. Bahadoran is unable to work in any substantive capacity due to the physical and mental trauma he has endured.

*Mr. Bahadoran Timely Filed a Notice of Claim*

75. Within ninety days after the June 4, 2020 assault, a written Notice of Claim, sworn by Plaintiff, was served upon Defendants at the Comptroller's Office at 1 Centre Street, New York, New York.

76. Mr. Bahadoran attended and testified at the hearing required under Section 50-H of the General Municipal Law on April 29, 2021, by video conference.

77. This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

### FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Substantive Due Process/Excessive Force
(Against Defendants Suarez and Rozanski)

78. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

79. On the morning of June 4, 2020, Defendants Suarez and Rozanski shot Plaintiff with their firearms at close range, striking Plaintiff's left arm and lower back and leaving him paralyzed from the waist down. Plaintiff was unarmed.

80. At all relevant times, there was no security or safety risk that would have justified the use of a firearm against Plaintiff.

81. Plaintiff did not pose an imminent threat to the safety of Defendants Suarez or Rozanski or others.

82. By shooting Plaintiff while he was unarmed, not a threat to the safety of any other individual, and in the midst of a mental health episode, Defendants Suarez and Rozanski engaged in outrageous and conscience-shocking conduct.

83. Defendants Suarez and Rozanski's use of their firearms against Plaintiff was a wanton and gratuitous use of deadly force vastly out of proportion to any danger Plaintiff could have posed.

84. By reason of the foregoing, and by shooting Plaintiff while he was unarmed, not a threat to the safety of any other individual, and in the midst of a mental health episode, Defendants Suarez and Rozanski used excessive, brutal, sadistic, and unconscionable force on Plaintiff, depriving him of the rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendment to the United States Constitution to be free from gratuitous and excessive force.

85. Defendants Suarez and Rozanski acted under pretense and color of state law and in their individual and official capacities and within the scope of their employments as NYPD officers and employees. Said acts by Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. These Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

86. Defendants Suarez and Rozanski are not immune from suit because it was apparent to them that their actions in using the deadly force of a firearm against Plaintiff when he was unarmed and not an immediate threat to Defendants was inconsistent with acceptable police practice and in violation of established precedent.

87. As a direct and proximate result of Defendants Suarez and Rozanski's misconduct detailed above, Plaintiff sustained the damages hereinbefore alleged.

**SECOND CAUSE OF ACTION**
Assault
(Against Defendants Suarez and Rozanski)

88. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

89. By reason of the foregoing, and by and by shooting Plaintiff with their firearms while Plaintiff was unarmed, not a threat to the safety of any other individual, and in the midst of a mental health episode, Defendants Suarez and Rozanski, acting in their capacities as NYPD officers and within the scope of their employment as such, committed offensive contact against Plaintiff and thereby committed a willful, unlawful, unwarranted, and intentional assault upon Plaintiff.

90. The assaults committed by Defendants Suarez and Rozanski were unnecessary and unwarranted in the performance of their duties as NYPD officers and constituted unreasonable use of their weapons.

91. Defendants Suarez and Rozanski were at all times agents, servants, and employees acting within the scope of their employment by the City of New York, which is therefore responsible for their conduct under the doctrine of *respondeat superior*.

92. As a direct and proximate result of Defendants' misconduct and abuse detailed above, Plaintiff sustained the damages hereinbefore alleged.

### THIRD CAUSE OF ACTION
Battery
(Against Defendants Suarez and Rozanski)

93. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

94. By reason of the foregoing, and by and by shooting Plaintiff with their firearms while Plaintiff was unarmed, not a threat to the safety of any other individual, and in the midst of a mental health episode, Defendants Suarez and Rozanski, acting in their capacities as NYPD officers and within the scope of their employment as such, intentionally committed harmful and offensive bodily contact against Plaintiff and thereby committed willful, unlawful, unwarranted, and intentional battery upon Plaintiff.

95. The batteries committed by Defendants Suarez and Rozanski were unnecessary and unwarranted in the performance of their duties as NYPD officers and constituted unreasonable use of their weapons.

96. Defendants Suarez and Rozanski were at all times agents, servants, and employees acting within the scope of their employment by the City of New York, which is therefore responsible for their conduct under the doctrine of *respondeat superior*.

97. As a direct and proximate result of Defendants' misconduct and abuse detailed above, Plaintiff sustained the damages hereinbefore alleged.

### FOURTH CAUSE OF ACTION
Negligence
(Against Defendants Suarez and Rozanski)

98. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

99. Defendants Suarez and Rozanski owed a duty of care to Plaintiff to use only the amount of force necessary and permitted by NYPD policy against Plaintiff during the

events alleged, because under the same or similar circumstances, a reasonable, prudent and careful person should have anticipated that injury to Plaintiff or to those in a like situation would probably result from the foregoing conduct.

100. Defendants Suarez and Rozanski knew or should have known that Plaintiff did not pose to either of them an imminent risk of serious injury or death and that the use of deadly force against Plaintiff was neither necessary nor permitted under NYPD policy. Yet Defendants Suarez and Rozanski nonetheless used deadly force against Plaintiff by shooting him in the arm and back without cause or justification and caused Plaintiff to be paralyzed from the waist down. These acts constituted a breach of Defendants Suarez and Rozanski's duty and directly and proximately caused the assault of Plaintiff on June 4, 2020.

101. Defendants Suarez and Rozanski were at all times agents, servants, and employees acting within the scope of their employment by the City of New York, which is therefore responsible for their conduct under the doctrine of *respondeat superior*.

102. As a direct and proximate result of the negligence detailed above, Plaintiff sustained the damages hereinbefore alleged.

## FIFTH CAUSE OF ACTION
Intentional Infliction of Emotional Distress
(Against Defendants Suarez and Rozanski)

103. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

104. Defendants Suarez and Rozanski engaged in extreme and outrageous conduct in shooting Plaintiff while he was unarmed, not physically attacking any individual, and in the midst of a mental health episode.

105. Defendants Suarez and Rozanski intended to cause Plaintiff severe emotional distress, or disregarded the substantial likelihood that their use of his weapon in this manner would cause Plaintiff such distress.

106. Defendants Suarez and Rozanski were at all times agents, servants, and employees acting within the scope of their employment by the City of New York, which is therefore responsible for their conduct under the doctrine of *respondeat superior*.

107. As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged, including but not limited to severe emotional distress.

## SIXTH CAUSE OF ACTION
Negligent Hiring/Training/Discipline/Retention of Employees
(Against Defendant City of New York)

108. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

109. Defendant City, through the NYPD, owed a duty of care to Plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to Plaintiff or to those in a like situation would probably result from the foregoing conduct.

110. Upon information and belief, Defendants Suarez and Rozanski were unfit and incompetent for their positions.

111. Upon information and belief, Defendant City, through the NYPD, failed to provide necessary, proper, and appropriate training for Defendants Suarez and Rozanski, including, but not limited to, failure to train and/or instruct them on the circumstances in which it is proper to use deadly force and the prohibition of the use of deadly force, including discharging a firearm, against an unarmed individual when there is no immediate risk of harm.

112. Upon information and belief, Defendant City's negligence in screening, hiring, training, disciplining, and retaining Defendants Suarez and Rozanski proximately caused each of Plaintiff's injuries.

113. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a. An award of compensatory damages against all Defendants in an amount to be determined at trial;

b. An award of punitive damages against Defendants Suarez and Rozanski in an amount to be determined at trial;

c. An award of reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

d. Such other and further relief as this Court may deem just and proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated: New York, New York
June 2, 2021

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By: _____/s/_____
Earl S. Ward
Jonathan S. Abady
Marissa R. Benavides
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*